# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF
## GEORGIA ATLANTA DIVISION

SIGNIFY HOLDING B.V.,

      Plaintiff,

  v.

KEYSTONE TECHNOLOGIES, LLC,

      Defendant.

C.A. No. 1:24-cv-02401-LMM

## PLAINTIFF SIGNIFY HOLDING B.V.'S BRIEF IN
## <u>RESPONSE TO DEFENDANT'S MOTION TO DISMISS</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

LEGAL STANDARD ......................................................................................... 8

ARGUMENT ...................................................................................................... 8

   I.   Venue Is Proper in the Northern District of Georgia .......................................... 9

     A.  Keystone "has committed acts of infringement" in this District ...................... 9

     B.  Keystone "has a regular and established place of business" in this District..... 9

       1.   The Atlanta Center is a physical place in this District................................. 10

       2.   The Atlanta Center is a "regular and established" place of business .......... 10

       3.   The Atlanta Center is a place "of" Keystone ............................................... 11

       4.   Keystone "has a regular and established place of business" through the acts of its agent in this District ................................................................................. 19

   II.  The Court Should Decline to Transfer This Case .............................................. 21

CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*3D Scan Guide, LLC v. Chrome Full Arch Guided Sys.*,
No. 2:23-CV-00194-JRG, 2024 U.S. Dist. LEXIS 45195 (E.D. Tex. Mar. 14,
2024) .................................................................................................................... 14, 18

*Arigna Tech. Ltd. v. Volkswagen AG*,
No. 2:21-cv-00054-JRG-RSP, 2022 U.S. Dist. LEXIS 129257 (E.D. Tex. Jan
20, 2022)
.................................................................................................................................. 20

*Celgene Corp. v. Mylan Pharms., Inc.*,
17 F.4th 1111 (Fed. Cir. 2021) ................................................................................ 12

*Darby v. U.S. Dep't of Energy*,
231 F. Supp. 2d 274 (D.D.C. 2002) ........................................................................... 8

*In re Cray Inc.*,
871 F.3d 1355 (Fed. Cir. 2017) ......................................................................... passim

*In re Google LLC*,
949 F.3d 1338 (Fed. Cir. 2020) ................................................................... 13, 17, 20

*In re Volkswagen Grp. of Am., Inc.*,
28 F.4th 1203 (Fed. Cir. 2022) ............................................................. 1, 17, 20, 21

*Iot Innovations LLC v. Monitronics Int'l. Inc.*,
No. 2:22-cv-0432-JRG-RSP, 2023 U.S. Dist. LEXIS 174400 (E.D. Tex. Sept.
10, 2023)
.............................................................................................................................. 14, 17

*JBS Hair, Inc. v. Sun Taiyang Co.*,
2022 U.S. Dist. LEXIS 95006 (N.D. Ga. May 26, 2022) ............................ 22, 23, 24

*One StockDuq Holdings v. Becton, Dickinson & Co.*,
No., 2013 U.S. Dist. LEXIS 36621 (W.D. Tenn. Mar. 13, 2013) ............................ 24

*Peerless Network, Inc. v. Blitz Telecom Consulting, LLC*,
No. 17-CV-1725, 2018 U.S. Dist. LEXIS 49628 (S.D.N.Y. Mar. 26, 2018)............. 10

*Peregrine Semiconductor Corp. v. RF Micro Devices, Inc.*,
2012 U.S. Dist. LEXIS 79912 (S.D. Cal. June 8, 2012).............................................. 24

iii

*Remington Rand Bus. Serv. v. Acme Card Sys. Co.*,
   7 F.2d 628 (4th Cir. 1934) ........................................................................ 11

*Sarvint Techs. v. Omsignal, Inc.*,
   161 F. Supp. 3d 1250 (N.D. Ga. 2015) ...................................................... 22

*Seven Networks, LLC v. Google LLC*,
   315 F. Supp. 3d 933 (E.D. Tex. 2018) ................................................ 13, 18

*SME Racks, Inc. v. Sistemas Mecanicos Para Electronica*,
   S.A., 382 F.3d 1097 (11th Cir. 2004) ........................................................ 25

*SRAM, LLC v. Fox Factory, Inc.*,
   2024 U.S. Dist. LEXIS 119610 (N.D. Ga. Mar. 6, 2024)............................ 21

*TC Heartland LLC v. Kraft Foods Grp. Brands LLC*,
   581 U.S. 258 (2017)..................................................................................... 9

*Tinnus Enters., LLC v. Telebrands Corp.*,
   No. 6:17-CV-00170, 2018 U.S. Dist. LEXIS 79068 (E.D. Tex. Mar. 9, 2018) .......... 13

*Wilson v. Jordan Auto's*,
   No. 1:08-cv-3778-JFK, 2009 U.S. Dist. LEXIS 20581 (N.D. Ga. Mar. 16, 2009) ........................................................................................................ 8

**RULES**

Rule 12(b)(3) ................................................................................................ 8

**STATUTES**

28 U.S.C. § 1400(b)............................................................................... passim

28 U.S.C. § 1404(a) .................................................................................. 8, 21

**OTHER AUTHORITIES**

https://bishop-brogdon.com/................................................................... 3, 10

https://www.keystonetech.com/our-story ...................................................... 2

Restatement (Third) of Agency § 1.01 ......................................................... 20

## INTRODUCTION

Keystone Technologies, LLC's ("Keystone") Motion to Dismiss (Dkt. 12) should be denied. "Keystone" may owe its name to its Pennsylvania roots, but in reality, it is one of the nation's largest lighting product sellers and, for more than a decade, has used the Northern District of Georgia as a major base of operation. Under Federal Circuit law, Keystone's leased, dedicated shelf space in the Atlanta Bishop & Brogdon warehouse is a regular and established place of business "of Keystone" from which it stores, sells, and delivers ███████████ of infringing product to its customers in the Southeast, including here in the Northern District. *See In re Cray Inc.*, 871 F.3d 1355, 1363 (Fed. Cir. 2017) ("Relevant considerations include whether the defendant owns or leases the place, or exercises other attributes of possession or control over the place."). Alternatively, Bishop & Brogdon is Keystone's agent in the district and venue is proper based on that agency relationship. *In re Volkswagen Grp. of Am.*, 28 F.4th 1203, 1208 (Fed. Cir. 2022).

Keystone's disownment of its Georgia presence is confounding. Prior to filing its Motion to Dismiss ("Motion"), Keystone proudly touted its presence here. In industry publications, Keystone told its customers that it "operates [a] fulfillment center[] in Atlanta." On its website, Keystone says that it "maintains [a] local market distribution center" in Atlanta. And under the heading "Who We Are" in its product catalog, Keystone listed Atlanta, GA among its many locations and even put a dot

on the map for Atlanta right under the photo of its CEO declarant, Mr. Ira Greenberg:



Keystone now attempts to distance itself from these representations. However, it is Keystone, and not a third party, who conducts business from a regular and established facility in the Northern District of Georgia. Accordingly, venue in this matter is proper, and this case should proceed in this Court.

## BACKGROUND

Keystone is a lighting company that manufactures and sells LED lighting throughout the United States. On its website, Keystone boasts that because of its "21 distribution centers across the nation, Keystone can facilitate exceptionally fast delivery to every point in the USA." https://www.keystonetech.com/our-story. *See* Ex. 1 (Website Timeline). One of those distribution centers is in Atlanta, GA.

To assist with the sales and distribution of its products in the Northern District (and surrounding states), Keystone has entered into an Agreement with Bishop & Brogdon ("Bishop"), a company located at 790 Great SW Pkwy SW, Atlanta, GA

30336 (the "Atlanta Center"). *See* https://bishop-brogdon.com/. Bishop has two main roles for Keystone: (1) acting as its "sales arm" in the Southeast, and (2) providing fulfillment, delivery, and "warehousing services" for its inventory.

**Keystone's "Sales Arm."** Keystone has contracted Bishop to be Keystone's outpost in Georgia. In the Agreement, "Keystone authorizes Sales Agency [*i.e.*, Bishop] to market, sell, and promote Keystone products in the Territory consisting of . . . Florida Panhandle, Georgia & Alabama." *See* Ex. 2 (2022 Agreement) at "Territory." Keystone also "authorizes Sales Agency [*i.e.*, Bishop] to, sell to electrical distributors and wholesalers and lighting distributors" but excludes several other industries and specific customers from the scope of this authorization. *See* Ex. 2 (2022 Agreement) at "Customer Base." As Mark Bates, CEO of Bishop, put it: "[F]rom an electrical distribution standpoint, we are—we are the—by contract, the sales arm for them." Ex. 3 (Bates Tr.) at 20:8–14, 53:18–25.

But while the Agreement empowers Bishop to "sell," Bishop does so only under Keystone's thumb. Bishop never owns the Keystone products it sells. *See* Ex. 2 (2022 Agreement) at "Consignment of Products" ("All Keystone Products sent to Sales Agency . . . remain property of Keystone until sold."). And Keystone's customers in this District never pay Bishop directly for infringing products. Ex. 3 (Bates Tr.) at 38:19-24. That's why purchase orders for Keystone products, even those received by Bishop, all go to Keystone. Ex. 4 (Greenberg Tr.) at 34:22-35:12;

3

Ex. 5 (02-15-24 Purchase Order); Ex. 6 (04-04-24 Purchase Order). After Bishop receives an order, Keystone itself invoices the customer, who then remits payment directly to Keystone. Ex. 4 (Greenberg Tr.) at 34:22-35:12.

Keystone also exercises extraordinary control over Bishop's sales activities. As noted, Keystone restricts Bishop's sales territory to the Florida Panhandle, Georgia, and Alabama regions (the "Southeast Region."). *See* Ex. 2 (2022 Agreement) at "Territory"; Ex. 3 (Bates Tr.) at 17:19–22. Keystone limits which customers within the Southeast Region (including this District) that Bishop can sell to. Ex. 2 (2022 Agreement) at Exhibit 1. And Keystone exclusively sets the price at which Bishop can sell Keystone products. Ex. 2 (2022 Agreement) at "Commission Schedule"; Ex. 3 (Bates Tr.) at 22:13–19 ("Q: Does Bishop & Brogdon have any discretion in [setting] the price? A: We really do not."). Keystone further provides "training modules" for Bishop's employees to use when selling Keystone products. *See* Ex. 3 (Bates Tr.) at 56:24 ("Q: And it's maintained—the [training modules are] maintained by Keystone? A: Absolutely.").

**Warehousing Services.** The Agreement between Keystone and Bishop also requires that Bishop "provide warehousing and fulfillment services [] for Keystone product." Ex. 2 (2022 Agreement) at "Warehousing Services." Bishop does not own the products held on pallets and on its shelving. *See* Ex. 2 (2022 Agreement) at "Consignment of Products." Keystone "reserves all rights to Products" and "shall be

granted access within 1 business day to inspect, count, repossess, . . . ship, move or take any other action with respect to Products." *See* Ex. 2 (2022 Agreement) at "Access to Products." Confirming that Bishop has no right, title to, or interest in the Keystone product it stores, in the event the Agreement is terminated it requires Bishop to "return all Products according to Keystone's instructions within 10 business days." *See* Ex. 2 (2022 Agreement) at "Access to Products."

Bishop must also fulfill orders that Keystone receives. Bishop has little discretion in this fulfillment process. For one, the Agreement provides that Bishop "agrees to conform to Keystone's requirements and instructions for packaging and shipping of Keystone Products." *See* Ex. 2 (2022 Agreement) at "Packaging and Shipping." A sample of the types of packaging and shipping instructions provided by Keystone are attached hereto as Exhibit 7 (Packing Instructions). In addition, Keystone tells Bishop how to ship the product and which carriers to use. *See* Dkt. 12-1 (Greenberg Decl.) at ¶ 19 (discussing the Atlanta Stocking Agent Routing Guide); Ex. 3 (Bates Tr.) at 27:15–28:5 (explaining that the Routing Guide provides Bishop with a first and second choice for which carrier to use).

Further, Bishop lacks control over which or how many products that Keystone chooses to store at the Atlanta Center. *See* Ex. 3 (Bates Tr.) at 23:23–24:10, 40:17–19 ("Q: . . . . Do you have any control over what Keystone products are stored in your warehouse? A: . . . . [t]hat's a—up to the discretion of Keystone."). As a result,

Keystone has chosen to store enough inventory in Atlanta to occupy several rows of floor-to-ceiling shelves and pallets in the Atlanta Center. In total, Keystone's inventory occupies approximately 5,000 sq. ft. of dedicated floor space within the Atlanta Center. Ex. 3 (Bates Tr.) at 40:17-19.



In exchange for these rights to store and control its inventory in the Atlanta Center, Keystone has agreed to pay Bishop a ████ , ████████████████████ ████████████████████████████████████████████████ *See* Ex. 2 (2022 Agreement) at "Warehouse Fee." In total, this amounts to approximately ████████████ that Keystone pays monthly for a potentially unlimited amount of space in the Atlanta Center where it can store whatever products it wants and can access or reclaim those products with one business days' notice. *See* Ex. 8 (Warehousing Payments).

**Customers Pick Up Orders from the Atlanta Center.** When Keystone sells products to a customer in or around the Northern District, that customer may (instead

of receiving a shipment) physically go to the Atlanta Center and pick up the order that they placed with Keystone. *See* Ex. 4 (Greenberg Tr.) at 91:21-23 ("Customers – Keystone customers can pick up their order at Bishop & Brogdon."). This is no rare occurrence. Keystone's records indicate that since May of 2022, its customers have picked up orders from the Atlanta Center on 419 separate occasions. *See* Ex. 4 (Greenberg Tr.) at 94:2-97:23 (discussing Exhibit 13); *see also* Ex. 9 (Pickup Spreadsheet) (filtered to show pickup orders).

**Customers Think Keystone is in Atlanta.** Before its Motion was filed, Keystone regularly held itself out as has having an Atlanta location. Keystone said it "operates [a] fulfillment center[] in Atlanta." Ex. 10 (10-11-2019 Blog Post). It also said that it "maintains [a] local market distribution center" in Atlanta. Ex. 11 (12-22-2023 Blog Post). Considering that Keystone also directs its customers to pick up orders from the Atlanta Center, it is unsurprising that its customers think that Keystone has a facility in Atlanta. For example, when issuing Purchase Orders, certain of Keystone's customers in the Northern District send their invoices to "Keystone Technologies" at the address of the Atlanta Center in Atlanta:



Ex. 12 (01-19-24 Purchase Order). This confusion has occurred multiple times. *See e.g.,* Ex. 13 (01-11-24 Purchase Order). Keystone's customers have also confused Bishop employees with Keystone's. *See e.g.*, Ex. 14 (Credit Increase) at 3 (listing Bishop employee Suzanne Alston as a contact at "Keystone Tech LLC.").

## LEGAL STANDARD

Proper venue in actions for patent infringement is controlled by 28 U.S.C. § 1400(b), which reads: "Any civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." 28 U.S.C. § 1400(b). Under section 1404(a), "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). "In considering a Rule 12(b)(3) motion, the court accepts the plaintiff's well-pled factual allegations regarding venue as true, draws all reasonable inferences from those allegations in the plaintiff's favor, and resolves any factual conflicts in the plaintiff's favor." *Wilson v. Jordan Auto's*, No. 1:08-cv-3778-JFK, 2009 U.S. Dist. LEXIS 20581, at *5 (N.D. Ga. Mar. 16, 2009) (quoting *Darby v. U.S. Dep't of Energy*, 231 F. Supp. 2d 274, 276–77 (D.D.C. 2002)).

## ARGUMENT

Venue is proper in this District. Keystone has commandeered a third party,

Bishop, as its place of business in this District. While the Atlanta Center is legally owned and technically operated by employees of Bishop, Keystone leases space in the Atlanta Center for its business in the district: it is Keystone who owns and sells *all* the Keystone-branded inventory stored there. Keystone controls and directs Bishop from afar, holding it out to customers and to the world as part and parcel of Keystone.

## I.   Venue Is Proper in the Northern District of Georgia

Keystone "has committed acts of infringement" and "has a regular and established place of business" in the Northern District of Georgia. Accordingly, this District is a proper venue under section 1400(b).[1]

### A. Keystone "has committed acts of infringement" in this District

Signify has properly alleged that Keystone has committed acts of infringement in this District, which Keystone does not dispute. Mot. at 5. The Court may accept Signify's well-pled infringement allegations as true for purposes of this Motion. *See In re Cordis Corp.*,[2] 769 F.2d 733, 737 (Fed. Cir. 1985) ("The issue of infringement is not reached on the merits in considering venue requirements.").

### B. Keystone "has a regular and established place of business" in this District

Keystone also "has a regular and established place of business" in the

---

[1] Signify acknowledges that Keystone does not "reside" in this District as it is organized under the laws of Pennsylvania. *See TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 581 U.S. 258, 261 (2017).

[2] Federal Circuit law controls as § 1400(b) venue is an issue unique to patent law.

Northern District of Georgia—the Atlanta Center. There are three requirements for a regular and established place of business: "(1) there must be a physical place in the district; (2) it must be a regular and established place of business; and (3) it must be the place of the defendant." *In re Cray Inc.*, 871 F.3d 1355, 1360 (Fed. Cir. 2017). The Federal Circuit also recognizes that "[i]n deciding whether a defendant has a regular and established place of business in a district, no precise rule has been laid down and each case depends on its own facts." *Id.* at 1362. The Atlanta Center meets all three *Cray* factors.

### 1.  The Atlanta Center is a physical place in this District

First, the Atlanta Center, a warehouse located at 790 Great SW Pkwy SW, Atlanta, GA 30336,[3] is a physical place in this District. *See* https://bishop-brogdon.com/. Keystone does not dispute this, so the Center[4] satisfies the first *Cray* factor. *See id.* at 1362.

### 2.  The Atlanta Center is a "regular and established" place of business

Second, Keystone has used the Atlanta Center continuously for over a decade,

---

[3] The Court may judicially notice that 790 Great SW Pkwy SW, Atlanta, GA 30336 is in the Northern District of Georgia.

[4] Alternatively, the Court may find that Keystone's 5,000 sq. ft. of shelf space in the Atlanta Facility constitutes a "physical place" in this District. *See Peerless Network, Inc. v. Blitz Telecom Consulting, LLC*, No. 17-CV-1725, 2018 U.S. Dist. LEXIS 49628, at *8–9 (S.D.N.Y. Mar. 26, 2018) (holding that shelf space constituted a "place" under the first *Cray* factor).

*see* Dkt. 13-1 (2012 Agreement), and it is thus a "regular and established" place of business. The second *Cray* factor measures the permanence of a defendant's business; it must be "carried on 'regularly' and not merely temporarily, or for some special work or particular transaction." *Id.* at 1362. Duration is relevant too. For example, the Federal Circuit has said that a five-year continuous presence in the district would meet the "regular and established" requirement. *See id.* at 1363 (citing *Remington Rand Bus. Serv. v. Acme Card Sys. Co.*, 7 F.2d 628, 629 (4th Cir. 1934)).

Keystone also does not dispute this *Cray* factor, nor can it. Since at least 2012, Keystone has used the Atlanta Center for its warehousing and sales in the Southeast Region. *See* Dkt. 13-1 (2012 Agreement); Ex. 2 (2022 Agreement); Ex. 3 (Bates Tr.) at 20:8–14, 53:18–25 ("Q: Within that territory, is Bishop & Brogdon the sole or exclusive outlet or vendor for Keystone products . . . ? A: From an electrical distribution standpoint, we are—we are the—by contract, the sales arm for them."). Accordingly, the Atlanta Center satisfies the second *Cray* factor.[5]

### 3. The Atlanta Center is a place "of" Keystone

The Atlanta Center is a place "of" Keystone for venue purposes. The third *Cray* factor measures the extent to which a defendant has established or ratified the place of business. *See Cray*, 871 F.3d at 1363. Relevant, non-exclusive

---

[5] Keystone has not raised an agency argument with respect to the second *Cray* factor. For Signify's discussion on agency, see *infra* Section I.B.4.

considerations include: "(1) 'whether the defendant owns or leases the place, or exercises other attributes of possession or control over the place'; (2) 'whether the defendant conditioned employment on' 'an employee's continued residence in the district' or 'the storing of materials at a place in the district so that they can be distributed or sold from that place'; (3) 'a defendant's representations' about that place, including advertisements; and (4) 'the nature and activity of the alleged place of business of the defendant in the district in comparison with that of other places of business of the defendant in other venues.'" *Celgene Corp. v. Mylan Pharms., Inc.*, 17 F.4th 1111, 1122 (Fed. Cir. 2021) (quoting *Cray*, 871 F.3d at 1363–64).

### i.   Keystone has established and ratified the Atlanta Center as its own place of business

The third *Cray* factor requires a defendant to establish and ratify a place of business as its own. Keystone has done exactly that. Keystone's inventory occupies 5,000 sq. ft. of space in the Atlanta Center, which at all times belongs to Keystone. Ex. 3 (Bates Tr.) at 40:17-19; Ex. 2 (2022 Agreement) at "Consignment of Products." When product is sold in the District, it is invoiced by Keystone directly to Keystone's customers, who then frequently arrive at the Atlanta Center to take possession of the items they purchased from Keystone. *See* Ex. 4 (Greenberg Tr.) at 94:2-97:23 (discussing Exhibit 13); *see also* Ex. 9 (Pickup Spreadsheet) (filtered to show pickup orders). That exact scenario has played out hundreds of times over the past two years. Ex. 9 (Pickup Spreadsheet) (filtered to show pickup orders). There

can be no doubt that Keystone conducts its business from the Atlanta Center. *See, e.g.*, *Seven Networks, LLC v. Google LLC*, 315 F. Supp. 3d 933, 965–66 (E.D. Tex. 2018) (determining that Google's rack space within ISP location in combination with Google's representations that the space was a Google location were sufficient to establish the third *Cray* factor).

> ### ii.   Keystone has "leased" space at the Atlanta Center

The Agreement between Keystone and Bishop is a commercial lease, rendering the Atlanta Center a place "of" Keystone. *See, e.g.*, *In re Google LLC*, 949 F.3d 1338, 1343– 44 (Fed. Cir. 2020) (noting that "leased shelf space or rack space can serve as a 'place' under the statute"); *Tinnus Enters., LLC v. Telebrands Corp.*, No. 6:17-CV-00170, 2018 U.S. Dist. LEXIS 79068, at *14 (E.D. Tex. Mar. 9, 2018), *report and recommendation adopted* 2018 U.S. Dist. LEXIS 78342 (E.D. Tex. May 1, 2018) (holding that "premium shelf space" leased by the defendant constituted a regular and established place of business). Keystone has the contractual right to store Keystone-owned goods at the Atlanta Center for which Keystone pays Bishop. Ex. 2 (2022 Agreement) at "Warehousing Services." Keystone controls the quantity of goods stored as well as the type. *See* Ex. 3 (Bates Tr.) at 23:23–24:10, 40:17–19 ("Q: . . . . Do you have any control over what Keystone products are stored in your warehouse? A: . . . . [t]hat's a—up to the discretion of Keystone."). Keystone controls when and how its goods depart from

the Atlanta Center. *See* Ex. 7 (Packing Instructions); Ex. 3 (Bates Tr.) at 27:15–28:5 (explaining that the Routing Guide provides Bishop with a first and second choice for which carrier to use). And Keystone has the right to access the Center. *See* Ex. 2 (2022 Agreement) at "Warehousing Services." The Keystone and Bishop relationship has all the material characteristics of a commercial lease. As a result, Keystone now occupies 5,000 sq.ft. of the Atlanta Center, sending Bishop a monthly check in exchange for the right to do so. *See* Ex. 8 (Warehousing Payments).

Even if the arrangement between Keystone and Bishop is not a "lease," Keystone nevertheless exercises control over the Atlanta Center[6] to render it a place "of" Keystone. *See, e.g.*, *3D Scan Guide, LLC v. Chrome Full Arch Guided Sys.*, No. 2:23-CV-00194-JRG, 2024 U.S. Dist. LEXIS 45195, at *11–12 (E.D. Tex. Mar. 14, 2024) (finding that control established venue under *Cray*); *Iot Innovations LLC v. Monitronics Int'l. Inc.*, No. 2:22-cv-0432-JRG-RSP, 2023 U.S. Dist. LEXIS 174400 (E.D. Tex. Sept. 10, 2023) (finding the same). The 2022 Agreement and Mr. Bates's testimony above both illustrate this point.

*First,* Keystone controls Bishop's sales territory of its products. *See* Ex. 2 (2022 Agreement) at "Territory"; Ex. 3 (Bates Tr.) at 17:22–25 ("Q: Bishop &

---

[6] Keystone argues that it lacks control over Bishop because it does not hire Bishop's employees. *See* Motion at 10. But it suffices for venue purposes that Keystone controls Bishop's business. *See Iot Innovations LLC v. Monitronics Int'l. Inc.*, No. 2:22-cv-0432-JRG-RSP, 2023 U.S. Dist. LEXIS 174400 (E.D. Tex. Sept. 10, 2023) (separately analyzing control over third party and its employees).

Brogdon allowed to sell outside of that territory with respect to Keystone? A: Not to customers outside of that market . . . .").

*Second*, Keystone controls Bishop's customer base. *See* Ex. 2 (2022 Agreement) at "Exhibit 1"; Ex. 3 (Bates Tr.) at 18:16–19 ("Q: . . . Is it that you don't have to sell to [the excluded customers], or are you prohibited from selling to them? A: That would be more of a prohibited to sell to.").

*Third*, Keystone exclusively sets the prices at which Bishop sells Keystone products. *See* Ex. 2 (2022 Agreement) at "Commission Schedule"; Ex. 3 (Bates Tr.) at 22:13–19.

*Fourth*, Keystone controls which and how many products—comprising 5,000 sq. ft. of space—are stored at the Atlanta Center. *See* Ex. 3 (Bates Tr.) at 23:23–24:10, 40:17–19 ("Q: . . . . Do you have any control over what Keystone products are stored in your warehouse? A: . . . . [t]hat's a—up to the discretion of Keystone.").

*Fifth*, Keystone creates "training and marketing" modules for Bishop employees to use with Keystone products. *See* Ex. 3 (Bates Tr.) at 56:24–57:1.

*Sixth*, Keystone maintains title to its product held at the Atlanta Center, retaining the right to access and inspect the Center within one business day's notice. *See* Ex. 2 (2022 Agreement) at "Warehousing Services."

*Seventh*, in every single sale, Bishop must conform to Keystone's packaging and shipping requirements and use its preferred carriers. *See* Ex. 2 (2022

Agreement) at "Warehousing Services" ("Sales Agency agrees to conform to Keystone's requirements and instructions. . . ."); Ex. 3 (Bates Tr.) at 27:15–28:5 ("Q: . . . Keystone is telling you which carrier to use to get [products] to the end customer, is that fair? A: . . . [T]hey give us a first choice and a second choice.").

Despite all this control, Keystone cites *JBS Hair, Inc. v. Beauty Essence, Inc.* to argue that Bishop is not a place of business "of" Keystone. No. 1:21-cv-1860-MLB, 2022 U.S. Dist. LEXIS 39024, at *6 (N.D. Ga. Mar. 4, 2022). But this case is distinguishable for many reasons listed above. In *Beauty Essence*, the plaintiff alleged only that the defendant "fulfill[ed] and/or ship[ped] products to and from one or more of the Georgia Warehouses" and that the defendant owned part of the inventory. *Id.* Without more, those allegations "show[ed] no indication of control." *Id.*

*Beauty Essence* is a far cry from the situation here where Keystone's control pervades every aspect of Bishop's activities with respect to the infringing products. Bishop sells infringing products selected by Keystone, to customers prescribed by Keystone, in a territory limited by Keystone, at prices controlled by Keystone, in a manner set by Keystone. Bishop is more than a warehouse for Keystone; it is Keystone's "sales arm" in the Southeast, and Keystone controls it as such. *See* Ex. 3 (Bates Tr.) at 20:13 ("[W]e are the – by contract, the sales arm for them.").

Keystone's other cited cases also involve far less control than is at issue here.

*Cf., e.g.*, *In re Volkswagen*, 28 F.4th 1203, 1211 (Fed. Cir. 2022) (emphasis added) (defendant lacked control over dealerships because it transferred title of cars to dealership and "retained no authority over ***the manner in—or price for***—which the car will be sold"); *Google*, 949 F.3d at 1346 (emphasis added) (defendant lacked control over server maintenance because "[m]aintaining equipment is meaningfully different from—as only ancillary to—actual producing, ***storing, and furnishing to customers*** of what the business offers").

In contrast to those cases, Keystone controls the price, customer, territory, and shipment of every Keystone product that Bishop sells. *See Iot Innovations*, 2023 U.S. Dist. LEXIS 174400, at *18 (E.D. Tex. Sept. 10, 2023) (noting under similar facts that "[i]n contrast to *Google II* and *Volkswagen II*, Brinks Home exercises the requisite level of control over the" third-party businesses). Accordingly, this consideration shows that the Atlanta Center is a place "of" Keystone.

### iii. Keystone conditions its relationship with Bishop on Bishop storing and distributing materials within this District

Keystone also conditions its relationship with Bishop on Bishop's storing and distributing materials within the Northern District of Georgia. By contract, Bishop must provide "Warehousing Services" for Keystone products in Atlanta. *See* Ex. 2 (2022 Agreement) at "Warehousing Services." Keystone reserves the right to

terminate this contract upon 30 days' notice if Bishop breached the contract and stopped warehousing for Keystone. *Id.* Accordingly, this consideration also shows that the Atlanta Center is a place "of" Keystone under the third *Cray* factor.

### iv. Keystone represents that Bishop is a place "of" Keystone

In both public and private communications, Keystone represents that Bishop is a place "of" Keystone. For example, Keystone advertises an Atlanta location on its own website. 10-11-2019 Blog Post ("Keystone operates fulfillment centers in Atlanta, Boston, . . . ."); *see* 12-22-2023 Blog Post ("Keystone also maintains local market distribution centers in 11 locations across the United States, including Atlanta . . . ."); *see also 3D Scan Guide*, 2024 U.S. Dist. LEXIS 45195, at *12 ("Moreover, on its website, [defendant] advertises to its customers that the Helm and Westbrook locations provide [its] products and services."); *Seven Networks, LLC*, 315 F. Supp. 3d at 965–66 (finding that Google servers within third-party ISPs were "places of Google" based on Google's website statement that "content traffic 'can come from multiple Google locations'").

Keystone's representations about its "Atlanta Center" also confuse its customers. For example, when customers issue purchase orders to Keystone, they often include the address for the Atlanta Center in Atlanta on the order. Ex. 12 (01-19-24 Purchase Order). In other instances, customers have confused the employees of Bishop with those of Keystone. *See* Ex. 14 (listing Suzanne Alston, a

Bishop Employee, a contact at Keystone). And in other instances, customers direct email correspondence to Bishop but refer to it as "Keystone." *See* Ex. 15 (Trade Show Email) at 2 (customer discussing with Bishop employee about "inviting your company Keystone" to a conference). Accordingly, this consideration also shows that the Atlanta Center is a place "of" Keystone under the third *Cray* factor.

### v. The scope of the business conducted at the Atlanta Center confirms that it is a place "of" Keystone

As detailed above, Keystone leases or at least exercises control over the Atlanta Center. Keystone may do more (or even the majority of) its business in Pennsylvania or from its "Regional Distribution Centers." But that doesn't matter. Section 1400(b) requires only a "regular and established place of business," and Keystone has one in this District via the Atlanta Center that is intended to service a significant portion of the Southeastern United States. All *Cray* factors are met.

### 4. Keystone "has a regular and established place of business" through the acts of an agent in this District

The Federal Circuit has held that the requirements of 28 U.S.C. § 1400(b) may be met when a defendant "has a regular and established place of business" through the acts of her agent in the district. *Volkswagen*, 28 F.4th at 1208. Here, Bishop is Keystone's agent, and Keystone "has a regular and established place of business" through Bishop's acts in this District. Keystone does not expressly dispute

this point in its motion. *See* Motion at 10–13.

Under Federal Circuit law,[7] "[t]he essential elements of agency are (1) the principal's 'right to direct or control' the agent's actions, (2) 'the manifestation of consent by the principal to the agent that the agent shall act on his behalf,' and (3) the 'consent by the agent to act.'" *Google*, 949 F.3d at 1346 (quoting Restatement (Third) of Agency § 1.01) (cleaned up).

First, Keystone controls Bishop. As discussed in Section I.B.3.i *supra*, Keystone maintains the right to direct and control Bishop. Keystone, alone, decides which of its products that Bishop must store; whom it can sell to; where it can sell; how it should sell the products; the price at which the products can be sold for; and how those products must be packaged and shipped. *See Arigna Tech. Ltd. v. Volkswagen AG*, No. 2:21-cv-00054-JRG-RSP, 2022 U.S. Dist. LEXIS 129257, at *24 (E.D. Tex. Jan 20, 2022) (finding agency relationship under section 1400(b) where principal had right to control dealership's minimum prices, training of its employees, and dictating the steps that employees must take to complete tasks).

Second, the evidence demonstrates that Keystone and Bishop have consented to an agency relationship. The 2022 Agreement between Keystone and Bishop

---

[7] "Agency" for patent venue differs from "agency" as the term is used in other contexts. The former is "unique to patent law," so the relevant authority here is Federal Circuit caselaw addressing agency under section 1400(b). *See Arigna Tech. Ltd. v. Volkswagen AG*, No. 2:21-cv-00054-JRG-RSP, 2022 U.S. Dist. LEXIS 129257, at *24 (E.D. Tex. Jan 20, 2022).

explicitly defines their relationship as a "Sales Agency." *See, e.g.*, Ex. 2 (2022 Agreement) ("Keystone authorizes Sales Agency to market, sell, and promote Keystone products in the Territory consisting of the NEMRA designated territory of Florida Panhandle, Georgia & Alabama."); Ex. 16 (01-17-24 Purchase Order) (referring to Bishop as "Agent"); *cf. Volkswagen*, 28 F.4th at 1212. Accordingly, Bishop is Keystone's agent under Federal Circuit law.

## II.    The Court Should Decline to Transfer This Case

Having established that venue is proper in the Northern District of Georgia, the Court should decline Keystone's half-hearted request to transfer this case. This Court looks to several factors in the § 1404(a) analysis, such as:

> (1) the convenience of the witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances.

*SRAM, LLC v. Fox Factory, Inc.*, 2024 U.S. Dist. LEXIS 119610, at *5–6 (N.D. Ga. Mar. 6, 2024);

The burden of proof is high, and "the movant must 'make a strong case for transfer' because, generally, 'a plaintiff's choice of forum is accorded considerable deference.'" *Id.* at *6 (quoting *Sarvint Techs. v. Omsignal, Inc.*, 161 F. Supp. 3d 1250, 1266 (N.D. Ga. 2015) (cleaned up). "Unless the balance lies strongly in favor

of transfer, 'the plaintiff's choice of forum should rarely be disturbed." *Id.* (quoting *Sarvint Techs.*, 161 F. Supp. 3d at 1266); *see also JBS Hair, Inc. v. Sun Taiyang Co.*, 2022 U.S. Dist. LEXIS 95006, at *6, 10–11 (N.D. Ga. May 26, 2022) (finding that defendant "failed to meet its heavy burden of persuading the Court" to transfer venue where defendant "lease[d] a warehouse in this district where it stores product").

Critically, for the few factors that Keystone addresses, it does so with little or no substantiation. When fully addressed, the factors weigh heavily against transfer.

*First*, "the convenience of the witnesses", the most important factor, favors keeping this case in the Northern District. Most of the nine patents in suit are the result of research and development efforts that occurred here, at Signify's subsidiary Cooper Lighting (located in Peachtree City). As is listed on the face of the '588, '350, '682, '300, '253, and '756 Patents, the inventors (eight in total) all reside in Georgia. And because many of the inventors are now third parties, the availability of compulsory process also favors litigating this case in the Northern District.

While Keystone contends that it has numerous witnesses in Pennsylvania, they are all party witnesses for whom compulsory process should not be necessary. Indeed, Keystone fails to identify a single key witness that is located in E.D.Pa, which is fatal to its motion. *Sun Taiyang Co.*, 2022 U.S. Dist. LEXIS 95006, at *4 ("The party seeking the transfer must support its motion by clearly specifying the key witnesses to be called and particularly stating the significance of their

testimony.")

*Second*, in direct contrast with statements in Keystone's motion, Keystone previously admitted that much of the relevant, discoverable material does not reside in Pennsylvania but in places elsewhere, including overseas. Indeed, Keystone told this court that it "sources a substantial number [of products] from overseas, largely through contract manufacturers located primarily (but not exclusively) in China. Keystone's overseas manufacturers, in turn, source many of their key components (e.g. driver circuits, LED light engines) from overseas vendors/suppliers, some in China, some further afield." *See* Joint Stmt., DOC ID 21, at 12. Because of this, Keystone, in asking for extended discovery time, told this Court that "third-parties (i.e. Keystone's sourcing partners) ***will likely hold some or all*** of the relevant technical documentation and information. Such third-parties operate at an arms-length to Keystone and most are located overseas." *Id*. at 15 (emphasis added). This factor weighs heavily against transfer.

*Third*, "trial efficiency" favors this case being litigated in this District. Pennsylvania is ***far less*** convenient for Signify given the above, and perhaps only marginally more convenient for Keystone. *See Sun Taiyang*, at *6 ("Where a transfer merely shifts the inconvenience from one party to another, Plaintiff's choice of forum should remain"). The proposed transferee forum (E.D. Pa.) does not have local patent rules. *See* Joint Stmt., DOC ID 21, at 12; *see also One StockDuq Holdings v.*

*Becton, Dickinson & Co.*, No., 2013 U.S. Dist. LEXIS 36621, at *23 (W.D. Tenn. Mar. 13, 2013) (denying transfer partly because unlike transferee court, transferor court "uses Local Patent Rules for the management of patent cases").

*Fourth*, contrary to Keystone's argument, the locus of operative facts does not favor transfer. As discussed above in factor two, much of the accused products are manufactured overseas. And Keystone told this Court that the bulk of relevant discoverable mater was in the hands of its foreign third-party manufacturers. Courts have recognized that "[g]iven the advances in electronic discovery and because the parties are large technology companies, they should have little difficulty conducting discovery regardless of document location." *Peregrine Semiconductor Corp. v. RF Micro Devices, Inc.*, 2012 U.S. Dist. LEXIS 79912, at *22 (S.D. Cal. June 8, 2012).

*Fifth,* as explained above, the availability of process to compel the attendance of unwilling witnesses militates against transfer. Keystone does not even address this factor—and for good reason—the bulk of the inventors of the asserted patents (third parties) are likely located in this district.

*Sixth*, the relative means of the parties is neutral. While Keystone bills itself as a "modest" company, it has sold ███████ of product through Bishop alone (who is responsible for only one "sales channel" and only in Georgia, Alabama, and the Florida Panhandle) in the first 7 months of this year alone. *See* Ex. 17 (2023 Sales Table). Keystone has the means to litigate this case in the Northern District.

*Seventh*, the forum's familiarity with patent law, is naturally neutral.

*Eighth*, Courts naturally employ a "strong presumption against disturbing plaintiff['s] initial forum choice." *SME Racks, Inc. v. Sistemas Mecanicos Para Electronica*, S.A., 382 F.3d 1097, 1100 (11th Cir. 2004).

*Ninth*, Keystone does not even attempt to address efficiency and interests of justice factor. Given that this is the only case proceeding between the parties, this factor should weigh again transfer.

Keystone has failed to meet its burden, and the Court should accordingly decline to transfer this case.

## CONCLUSION

For the foregoing reasons, the Court should deny Keystone's Motion in its entirety.

Respectfully submitted this 28th day of October, 2024.

/s/ *Joshua M. Weeks*
Adam D. Swain
ALSTON & BIRD LLP
950 F. Street, NW
Washington, D.C. 20004
Telephone: (202) 239-3300
adam.swain@alston.com

Joshua M. Weeks
Georgia Bar No. 545063
ALSTON & BIRD LLP
1201 W. Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7405
joshua.weeks@alston.com

*Attorneys for Plaintiff Signify Holding B.V*

## **CERTIFICATE OF COMPLIANCE**

I certify that this brief has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C). Specifically, this brief has been prepared using 14-pt Times New Roman font.

This 28th day of October, 2024.

/s/ *Joshua M. Weeks*
Joshua M. Weeks

## **CERTIFICATE OF SERVICE**

This is to certify that I have this day electronically filed the foregoing Plaintiff Signify Holding B.V.'s Response to Defendants' Motion to Dismiss with the Clerk of Court using the CM/ECF System.

This 28th day of October, 2024.

/s/ *Joshua M. Weeks*
Joshua M. Weeks